23-6598-cr
*United States v. Saab*

# United States Court of Appeals
# for the Second Circuit

_____

August Term 2024

(Argued: January 10, 2025      Decided: January 14, 2026)

No. 23-6598-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

ALEXEI SAAB, AKA ALI HASSAN SAAB, AKA ALEX SAAB, AKA RACHID,

*Defendant-Appellant.*

_____

Before:      SULLIVAN, BIANCO, and ROBINSON, *Circuit Judges*.

In 2022, after a jury trial, Appellant-Defendant Alexei Saab was convicted of, *inter alia*, receiving military-type training from Hizballah (also known as Hezbollah)—a designated foreign terrorist organization ("FTO")—from 1996 to 2005, in violation of 18 U.S.C. §§ 2339D, 3238 ("Count Three"). In sentencing Saab

principally to ten years' imprisonment on Count Three, the district court (Paul G. Gardephe, *Judge*) applied a twelve-level enhancement and an automatic criminal history category of VI under United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 3A1.4 (the "Terrorism Enhancement") because it determined that the Section 2339D offense "involved . . . a federal crime of terrorism." U.S.S.G. § 3A1.4. However, neither the parties nor the district court below appeared aware that Section 2339D was not enacted until December 17, 2004. *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 6602, 118 Stat. 3638, 3761 (2004). Nor were they apparently aware of the fact that the waiver of statute of limitations under 18 U.S.C. § 3286(b) (the "Limitations Waiver") and the Terrorism Enhancement did not apply to Section 2339D offenses until March 9, 2006—*i.e.*, after all of Saab's charged conduct related to Count Three had occurred—by way of an amendment to a definitional provision they cross-reference: namely, 18 U.S.C. § 2332b(g)(5)(B). *See* USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 112, 120 Stat. 192, 209 (2006).

On appeal, conceding that plain error review applies, Saab asks us to vacate his conviction and sentence on Count Three because: (1) he was convicted based on conduct predating the enactment of Section 2339D, in violation of his due process rights; (2) the retroactive application of the Limitations Waiver to his Section 2339D offense violated the *Ex Post Facto* Clause and the presumption against retroactive legislation; (3) even if the Limitations Waiver did apply, the district court failed to instruct the jury that Saab's receipt of military-type training must have "created a foreseeable risk of [] death or serious bodily injury to another person," 18 U.S.C. § 3286(b), after Section 2339D's enactment date; (4) there was insufficient evidence to establish that such a risk was foreseeable; and (5) the district court's retroactive application of the Terrorism Enhancement violated the *Ex Post Facto* Clause.

We first conclude that, although the district court should have instructed the jury that it could only convict Saab for his post-enactment conduct, there is no reasonable probability that the jury would have acquitted him absent the error

2

because of the substantial evidence at trial that Saab received military-type training after December 17, 2004. Second, we hold that, because the Section 2339D statute of limitations had not elapsed, the Limitations Waiver can apply retroactively to Saab's receipt of military-type training. As to the challenge to the Limitations Waiver jury instruction, although the district court should have instructed the jury that it must find that Saab's receipt of military-type training created a foreseeable risk of death or serious bodily injury after December 17, 2004, Saab again has not demonstrated that there was a reasonable probability of an acquittal absent this error in light of the substantial evidence that Saab's post-enactment conduct created such a foreseeable risk. Finally, because the district court plainly erred by applying the Terrorism Enhancement and the record does not clearly indicate the district court would apply the enhancement on the alternative basis proffered on appeal by the government, we vacate the sentence and remand for resentencing.

Accordingly, we **AFFIRM** the convictions, **VACATE** the sentence and **REMAND** the case for resentencing consistent with this opinion. Judge Sullivan concurs in part and dissents in part in a separate opinion.

> FOR APPELLEE: SAM ADELSBERG, Assistant United States Attorney (Jason A. Richman and Olga I. Zverovich, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, New York.
>
> FOR DEFENDANT-APPELLANT: MATTHEW W. BRISSENDEN, Matthew W. Brissenden, P.C., Garden City, New York.

JOSEPH F. BIANCO, *Circuit Judge*:

In 2022, after a jury trial, Appellant-Defendant Alexei Saab was convicted of, *inter alia*, receiving military-type training from Hizballah (also known as

3

Hezbollah)—a designated foreign terrorist organization ("FTO")—from 1996 to 2005, in violation of 18 U.S.C. §§ 2339D, 3238 ("Count Three"). In sentencing Saab principally to ten years' imprisonment on Count Three, the district court (Paul G. Gardephe, *Judge*) applied a twelve-level enhancement and an automatic criminal history category of VI under United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 3A1.4 (the "Terrorism Enhancement") because it determined that the Section 2339D offense "involved . . . a federal crime of terrorism." U.S.S.G. § 3A1.4. However, neither the parties nor the district court below appeared aware that Section 2339D was not enacted until December 17, 2004. *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 6602, 118 Stat. 3638, 3761 (2004). Nor were they apparently aware of the fact that the waiver of statute of limitations under 18 U.S.C. § 3286(b) (the "Limitations Waiver") and the Terrorism Enhancement did not apply to Section 2339D offenses until March 9, 2006—*i.e.*, after all of Saab's charged conduct related to Count Three had occurred—by way of an amendment to a definitional provision they cross-reference: namely, 18 U.S.C. § 2332b(g)(5)(B). *See* USA PATRIOT Improvement

and Reauthorization Act of 2005, Pub. L. No. 109-177, § 112, 120 Stat. 192, 209 (2006).

On appeal, conceding that plain error review applies, Saab asks us to vacate his conviction and sentence on Count Three because: (1) he was convicted based on conduct predating the enactment of Section 2339D, in violation of his due process rights; (2) the retroactive application of the Limitations Waiver to his Section 2339D offense violated the *Ex Post Facto* Clause and the presumption against retroactive legislation; (3) even if the Limitations Waiver did apply, the district court failed to instruct the jury that Saab's receipt of military-type training must have "created a foreseeable risk of [] death or serious bodily injury to another person," 18 U.S.C. § 3286(b), after Section 2339D's enactment date; (4) there was insufficient evidence to establish that such a risk was foreseeable; and (5) the district court's retroactive application of the Terrorism Enhancement violated the *Ex Post Facto* Clause.

We first conclude that, although the district court should have instructed the jury that it could only convict Saab for his post-enactment conduct, there is no reasonable probability that the jury would have acquitted him absent the error

5

because of the substantial evidence at trial that Saab received military-type training after December 17, 2004. Second, we hold that, because the Section 2339D statute of limitations had not elapsed, the Limitations Waiver can apply retroactively to Saab's receipt of military-type training. As to the challenge to the Limitations Waiver jury instruction, although the district court should have instructed the jury that it must find that Saab's receipt of military-type training created a foreseeable risk of death or serious bodily injury after December 17, 2004, Saab again has not demonstrated that there was a reasonable probability of an acquittal absent this error in light of the substantial evidence that Saab's post-enactment conduct created such a foreseeable risk. Finally, because the district court plainly erred by applying the Terrorism Enhancement and the record does not clearly indicate the district court would apply the enhancement on the alternative basis proffered on appeal by the government, we vacate the sentence and remand for resentencing.

Accordingly, we **AFFIRM** the convictions, **VACATE** the sentence and **REMAND** the case for resentencing consistent with this opinion.

# BACKGROUND

## I.     Factual Background[1]

Saab was born and raised in Lebanon.  In 1996, while he was a student at the University of Lebanon, Saab was recruited into Hizballah, which the United States has designated as an FTO since 1997.  Saab's early years with Hizballah included surveillance tasks, weapons training, as well as training for violent field work.  His initial assignments included surveilling Israeli soldier checkpoints and security procedures to help facilitate Hizballah's improvised explosive device ("IED") operations against Israeli targets in the area.  At some point in 1998, Hizballah ordered Saab and his brother to place an IED in Yaroun, Lebanon to target an Israeli convoy that would carry a high-ranking Israeli official.  Saab later learned that the IED had detonated, damaging an Israeli convoy and injuring an Israeli official.  Saab also received weapons training from Hizballah in or around 1999, including in the use of pistols, automatic rifles, and grenades.

---

[1]  The following facts are drawn from the evidence presented at trial.  Because the jury found Saab guilty of Count Three, we consider the evidence in the light most favorable to the government.  *See United States v. Scully*, 877 F.3d 464, 468–69 (2d Cir. 2017).

In 2000, Saab moved from Lebanon to the United States. However, between 2000 to 2004, he often traveled back to Lebanon, where he continued meeting with his Hizballah handler. During this period, Saab came to understand that he was being trained to join Hizballah's External Security Organization ("ESO"), which is responsible for terrorist attacks and intelligence collection outside of Lebanon. The transition to external operations included various intelligence and explosives trainings, beginning in approximately 2003. As part of those trainings, he also participated in field exercises to hone his surveillance and countersurveillance techniques. Around the same time, Saab also engaged in a field operation in which he was directed to shoot an individual purported to be an Israeli spy.

In 2004 and 2005, Saab received extensive explosives training from Hizballah. He received approximately three weeks of classroom training in Lebanon on triggering mechanisms, explosive substances, detonators, and the assembly of circuits. He then put his classroom learnings to the test in field exercises, which involved building and testing IEDs. In particular, he constructed "a sticky bomb," which he detonated during the field training. App'x at 267. In or around April 2005, on his trip back to the United States from Lebanon, airport

8

security detected explosive residue on his luggage, which Saab attributed to his participation in the explosives field training exercises.

Saab also continued to receive surveillance training in 2005. As part of that training, Saab was directed to go to Istanbul, Turkey to create a city guide. He conducted site surveillance to assess security and structural weaknesses of certain religious structures, commercial structures, and bridges in Istanbul, and took photographs of those structures.

In addition, Saab utilized what he learned during his surveillance trainings on the ground in the United States. For example, he surveilled and photographed more than 40 potential targets in New York City, including the Port Authority Bus Terminal, Brooklyn Bridge, and Manhattan Bridge. The purpose of this site surveillance was in part to allow Hizballah to determine the size and placement of explosives needed to destroy those structures. He provided his findings to his Hizballah handler in a written report, which included annotated maps and detailed narrative descriptions of those locations and their security protocols.

Saab ceased all activities for Hizballah in or around the spring of 2005.

9

## II.    District Court Proceedings

Saab was indicted on September 19, 2019.    He was charged with (1) conspiring to provide material support to Hizballah, in violation of 18 U.S.C. § 2339B ("Count One"); (2) providing material support to Hizballah, in violation of 18 U.S.C. §§ 2339B and 2 ("Count Two"); (3) receiving military-type training from Hizballah, in violation of 18 U.S.C. §§ 2339D and 3238 ("Count Three"); (4) conspiring to commit marriage fraud, in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. § 371 ("Count Four"); (5) committing citizenship application fraud, in violation of 18 U.S.C. §§ 1546(a) and 2 ("Count Five"); (6) committing naturalization fraud, in violation of 18 U.S.C. §§ 1015(a) and 2 ("Count Six"); and (7) making false statements, in violation of 18 U.S.C. §§ 1001 and 2 ("Count Seven").[2]

---

[2] The indictment also charged Saab with conspiring to receive military-type training from Hizballah, in violation of 18 U.S.C. §§ 371, 2339D, and 3238, and unlawfully procuring citizenship or naturalization to facilitate an act of international terrorism, in violation of 18 U.S.C. §§ 1425(a) and 2.  However, the government moved to dismiss those counts before trial.

After a three-week trial, the jury found Saab guilty on Counts Three, Four, and Seven, and acquitted him on Counts One, Five, and Six. The jury hung on Count Two, which the government subsequently dismissed. On May 23, 2023, the district court sentenced Saab to an aggregate of twelve years' imprisonment, which consisted of ten years' imprisonment on Count Three and two-years' imprisonment on Counts Four and Seven. In doing so, the district court applied the Terrorism Enhancement—which added twelve offense levels and automatically increased Saab's criminal history category from I to VI—because it determined that the Section 2339D conviction "involved . . . a federal crime of terrorism." U.S.S.G. § 3A1.4.

Saab appeals only his conviction and sentence for Count Three.

## DISCUSSION

### I. Due Process Claim

We begin by addressing Saab's argument that he was impermissibly convicted for conduct that predated the enactment of 18 U.S.C. § 2339D, in violation of his due process rights.

Section 2339D was enacted on December 17, 2004, as part of the Intelligence

11

Reform and Terrorism Prevention Act of 2004. Pub. L. No. 108-458, § 6602, 118 Stat. 3638, 3761 (2004). Section 2339D punishes "[w]hoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training . . . as a foreign terrorist organization." 18 U.S.C. § 2339D(a). "Military-type training" is defined as "includ[ing] training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction." 18 U.S.C. § 2339D(c)(1).

The government charged and introduced evidence at trial that Saab received military-type training from Hizballah between 1996 and 2005, in violation of Section 2339D. The jury convicted Saab on that charge. Saab now points out that the jury was not instructed on Section 2339D's enactment date and contends that the jury therefore impermissibly convicted him based on conduct committed prior to that date, in violation of the Due Process Clause.

Saab did not make this objection below; we therefore review for plain error. *See United States v. Marcus*, 560 U.S. 258, 260 (2010) ("*Marcus II*"). We may correct

an error not raised at trial only where an appellant demonstrates that: "(1) there is an error; (2) the error is plain, that is, the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010) ("*Marcus III*") (alteration adopted) (internal quotation marks and citation omitted). We conclude, as the government concedes, that there was error, and that the error was clear and obvious. *See Marcus II*, 560 U.S. at 264 ("[I]f the jury, which was not instructed about [the criminal statute's] enactment date, erroneously convicted [defendant] based exclusively on noncriminal, preenactment conduct, [the defendant] would have a valid due process claim."). We therefore focus on the third and fourth factors.

To satisfy the third and fourth factors of the plain error standard, "the overall effect of the . . . error must have been sufficiently great such that there is a reasonable probability that the jury would not have convicted him absent the

13

error."[3] *Marcus III*, 628 F.3d at 42. In other words, the inquiry requires us to assess whether "the jury would have acquitted" Saab if it had been correctly instructed that it could not convict Saab based exclusively on his pre-enactment conduct. *Id.*; *accord United States v. Hild*, 147 F.4th 103, 115 (2d Cir. 2025) (concluding "there is no reasonable probability that the jury would have acquitted" the defendant absent the error). In making this assessment in the due process context we consider (1) whether "the government presented post-enactment evidence sufficient to satisfy the elements" of the relevant criminal statute, and, if so, (2) whether the pre- and post-enactment conduct "differed materially . . . such that there is a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings." *Marcus III*, 628 F.3d at 42, 44. After a careful review of the trial

---

[3] Saab asserts that the standard is "whether there is a reasonable possibility that the jury might have convicted [the defendant] based exclusively on pre-enactment conduct." Appellant's Br. at 37–38 (internal quotation marks and citation omitted). What he quotes, however, is the concurrence in *United States v. Marcus*, 538 F.3d 97, 104 (2d Cir. 2008) ("*Marcus I*") (Sotomayor, J., concurring). *Marcus III* did not adopt this standard and instead articulated the different standard quoted above. None of our Circuit's cases have used the standard Saab relies on from the *Marcus I* concurrence.

evidence, we conclude that there is no reasonable probability that the jury would have acquitted Saab if it were properly instructed that it could not convict Saab for his non-criminal pre-enactment conduct.

First, the government "presented post-enactment evidence sufficient to satisfy the elements of" Section 2339D. *Id*. at 42. Saab's contentions that the post-enactment evidence is "slim and ambiguous," and that the precise dates of his post-2005 training "are unclear from the record," Appellant's Br. at 40, are flatly belied by the record. As set forth below, substantial evidence adduced at trial supports that Saab received both explosives and surveillance training from Hizballah in 2005.[4]

Special Agent Anthony Cipriano of the Federal Bureau of Investigation ("FBI"), who interviewed Saab on numerous occasions, testified that Saab admitted to receiving three weeks of extensive explosives training "in approximately 2004 *and 2005*," in an "underground classroom [at a safe house]

---

[4] Saab does not dispute on appeal that, as a general matter, surveillance and countersurveillance training can constitute "military-type training" as defined under 18 U.S.C. § 2339D(c)(1).

that would be used for training" in Lebanon. App'x at 314 (emphasis added). Saab explained to Special Agent Cipriano that he received "training in the specific shapes of explosive charges," "in triggering mechanisms, circuits, and detonators, as well as constructing an IED which we refer to as a telescopic bomb." *Id.* at 314–15. Saab also told Special Agent Cipriano that they used explosive substances such as "C4," "ammonium nitrates," and "RDX" ("research developed explosive"). *Id.* at 315–16. Saab also described building and testing IEDs, including a sticky bomb, which he successfully detonated. Special Agent Cipriano's testimony is corroborated by the fact that Saab was able to draw from memory three diagrams of IED mechanisms during one of the FBI interviews. Those diagrams were introduced into evidence, and FBI Special Agent Bomb Technician Brian Murtagh testified that the diagrams contained the components required for viable explosive devices.

Crucially, Saab's admission that this explosives training extended into 2005—*i.e.*, after Section 2339D's enactment—is further supported by several other pieces of trial evidence. In particular, Saab told Agent Cipriano that part of his explosives training included analyzing a photograph of "the blast site from the

16

assassination" of former Lebanese Prime Minister Rafic Hariri, "who was assassinated on *February 14, 2005*," to "determine where the center of the explosion was, the triggering mechanism, if possible, to determine that was used, as well as the type of explosive, whether it was improvised or a military-grade explosive." *Id.* at 389–90 (emphasis added). In addition, Saab's backpack tested positive for explosives residue—specifically for "RDX," a substance used during Saab's explosives trainings—in April 2005 at an airport in Istanbul, Turkey, while he was traveling to the United States from Lebanon. In his conversation with Agent Cipriano, Saab attributed the explosives residue on his backpack, which he brought with him to the explosives trainings, to his field training exercises.

The government also introduced evidence that Saab received surveillance training in 2005. Agent Cipriano testified that Saab described "that during his surveillance training he was directed to go to Istanbul, Turkey and create a city guide for that city" in "December 2004, January 2005." *Id.* at 316–17 (emphasis added). Saab's trip is corroborated by photographs depicting religious buildings, commercial structures, and bridges in Istanbul, which were recovered from a folder on his computer's hard drive titled "0501 14-16 Istanbul." *Id.* at 320–23. The

government also recovered an Istanbul City Guide during a search of Saab's residence. That this trip occurred in 2005 is corroborated by Saab's passport, introduced as evidence at trial, which contained a visa to Turkey dated January 10, 2005, and an entry stamp to Turkey dated January 15, 2005. In sum, the government presented substantial evidence that Saab received both explosives and surveillance training from Hizballah in 2005.

With respect to the second consideration under *Marcus III*, we conclude that Saab's receipt of military training, before and after December 17, 2004, does not differ in any material respect. The trial evidence established that Saab received weapons training in 1999 and explosives training in 2003 and continued to receive explosives training in 2004 and 2005. Similarly, Saab received intelligence and counterintelligence training before December 2004 and continued to receive similar training in 2005. In short, based upon the timing and nature of Saab's training activities, we have no trouble holding that the pre-enactment and post-enactment conduct did not differ "in a manner that would lead us to conclude that there is a reasonable probability that the jury would not have convicted him absent the due process error." *Marcus III*, 628 F.3d at 43.

18

Saab's arguments to the contrary are unavailing. Saab first contends that the "overwhelming bulk of the evidence that was introduced in this case" related to pre-enactment conduct. Appellant's Br. at 39. Although Saab is correct in that observation, his argument misses the mark. In light of the substantial evidence of Saab's 2005 conduct described above, he does not persuasively argue that "*absent the error*"—*i.e.*, if the jury were instructed that it could not convict Saab exclusively for his pre-enactment conduct—"the jury would not have convicted him." *Marcus III*, 628 F.3d at 42 (emphasis added). Indeed, in *Marcus III,* we rejected a similar argument that the government's introduction of substantial evidence of pre-enactment conduct prejudiced the defendant. We concluded that "[t]he Government presented substantial evidence of Marcus's post-enactment conduct, and nothing about the nature or quantity of the evidence of Marcus's pre-enactment conduct leads us to conclude that it is reasonably probable that the jury would have acquitted Marcus but for the evidence of Marcus's pre-enactment conduct." *Marcus III*, 628 F.3d at 43. We reach the same conclusion regarding the evidence here, and thus discern no daylight between Saab's argument and the one we rejected in *Marcus III*.

We also reject Saab's argument that the "discrete incidents of training, which differed over time" are "analogous to the sex trafficking count vacated" in *Marcus III*. Appellant's Br. at 41. The sex trafficking statute at issue in that case, which became effective in October 2000, punishes those who knowingly "recruit[], entice[], harbor[], transport[], provide[], [or] obtain[] . . . by any means a person . . . knowing . . . that means of force, threats of force, fraud, [or] coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1) (2000). The government presented evidence that Marcus recruited and enticed the victim in 1998, transported her across state lines in early 2000, and harbored her from 1999 to 2001. *Marcus III*, 628 F.3d at 44. The panel vacated the conviction because the evidence of pre- and post-enactment conduct involved materially different and independently sufficient acts to constitute sex trafficking, and the evidence of the post-enactment conduct—the harboring—"was not 'overwhelming'"; it was therefore possible that the jury could have "concluded that Marcus did not harbor [the victim] within the meaning of the statute." *Marcus I*, 538 F.3d at 105 & n.4 (Sotomayor, *J.*, concurring); *accord Marcus III*, 628 F.3d at 44.

20

Here, by contrast, a plethora of evidence indicated that (1) Saab received substantially the same type of military training before and after Section 2339D's enactment, and (2) the explosives training he received both before and after December 2004 is quintessential "military-type training." *See* 18 U.S.C. § 2339D(c)(1) (defining "military-type training" as, *inter alia*, "training on the use, storage, production, or assembly of any explosive, firearm or other weapon"). Thus, the likelihood that the jury could have concluded that Saab did not receive military-type training after December 2004 "within the meaning of the statute," *Marcus I*, 538 F.3d at 105 (Sotomayor, *J.*, concurring), is remote at best.

Accordingly, Saab cannot satisfy the plain error standard because "there is no reasonable probability that the jury would have acquitted [Saab] absent" the due process error. *Marcus III*, 628 F.3d at 42.

## II.    Retroactive Application of the Limitations Waiver

We next consider whether the district court should not have applied the Limitations Waiver to the Section 2339D charge.

18 U.S.C. § 3286(b) waives the ordinary five-year statute of limitations for certain federal criminal offenses. *See* 18 U.S.C. § 3282(a).  Section 3286(b) provides

21

that "[n]otwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a for[e]seeable risk of, death or serious bodily injury to another person." In turn, 18 U.S.C. § 2332b(g)(5)(B) provides a list of criminal code violations that, if "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *id.* §2332b(g)(5)(A), constitute a "Federal crime of terrorism," *id.* § 2332b(g)(5). On March 9, 2006, Congress added Section 2339D to the list of offenses in Section 2332b(g)(5)(B) through the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 112, 120 Stat. 192, 209 (2006). Consequently, as of that date, the Limitations Waiver applied to Section 2339D offenses.

Saab argues that because the Limitations Waiver applied to Section 2339D only after he had stopped receiving military-type training, its application here violated the *Ex Post Facto* Clause and the presumption against retroactive legislation. The government contends that Saab waived this argument, which, in any event, fails on the merits. Even assuming that Saab preserved this argument,

22

we agree with the government.

The *Ex Post Facto* Clause prohibits Congress from passing a law that "(1) makes an act a crime that was legal when committed; (2) makes a crime greater than it was when it was committed; (3) increases the punishment for a crime after it has been committed; or (4) deprives the accused of a legal defense that was available at the time the crime was committed." *United States v. Harris*, 79 F.3d 223, 228 (2d Cir. 1996) (citing *Collins v. Youngblood*, 497 U.S. 37, 41–42 (1990)). A defendant raising an *Ex Post Facto* Clause challenge "must show that as applied to his own sentence the law created a significant risk of increasing his punishment." *Garner v. Jones*, 529 U.S. 244, 255 (2000); *see Miller v. Florida*, 482 U.S. 423, 430 (1987) ("[T]o fall within the *ex post facto* prohibition," the law "must disadvantage the offender affected by it." (internal quotation marks and citation omitted)).

Even if a retroactive statute would not run afoul of the *Ex Post Facto* Clause, there is nevertheless a "presumption against retroactivity that is deeply rooted in our jurisprudence." *Olivieri v. Stifel, Nicolaus & Co.*, 112 F.4th 74, 90 (2d Cir. 2024) (internal quotation marks and citation omitted). To determine whether Congress intended for its legislation to be applied retroactively, we follow the two-step

23

framework that the Supreme Court set forth in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).[5]  At step one, "if Congress expressly prescribed that a statute applies retroactively to antecedent conduct, the inquiry ends and the court enforces the statute as it is written, save for constitutional concerns."  *Weingarten v. United States*, 865 F.3d 48, 54–55 (2d Cir. 2017) (alteration adopted) (internal quotation marks and citation omitted).  Even if the statute does not *expressly* prescribe the statute's proper reach, "we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying our normal rules of construction."  *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (internal quotation marks and citation omitted).  If the statute remains "ambiguous or contains no express command regarding retroactivity," then we turn to step two, where we "must determine whether applying the statute to antecedent conduct would create presumptively impermissible retroactive effects."  *Weingarten*, 865 F.3d at 55 (internal quotation marks and citation omitted); *accord Fernandez-Vargas*,

---

[5]  The "*Landgraf* analysis applies to both civil and criminal statutes."  *Weingarten v. United States*, 865 F.3d 48, 55 n.6 (2d Cir. 2017).

548 U.S. at 37. "If it would, then the court shall not apply the statute retroactively absent clear congressional intent to the contrary." *Weingarten*, 865 F.3d at 55 (internal quotation marks and citation omitted). "If it would not, then the court shall apply the statute to antecedent conduct." *Id.* At bottom, "deciding when a statute operates retroactively is not always a simple or mechanical task, and courts must rely on judges' sound instincts, as well as the principles of affording parties fair notice, protecting reasonable reliance, and guarding settled expectations, to guide their analyses." *Id.* at 56 (alteration adopted) (internal quotation marks and citations omitted).

As an initial matter, we decline Saab's invitation for us to focus on the propriety of retroactively applying Section 2332b(g)(5), as amended in March 2006 to include Section 2339D offenses, rather than the Limitations Waiver. By its terms, Section 2332b(g)(5) is nothing more than a definitional provision that lists certain criminal offenses that, if "calculated to influence or affect the conduct of government by intimidation or coercion," would constitute "Federal crime[s] of terrorism." 18 U.S.C. § 2332b(g)(5). The provision itself is silent as to any substantive consequences of that designation. Instead, the substantive effects are

25

borne out in other statutes, as well as the Guidelines, which cross-reference Section 2332b(g)(5)(B). The evident congressional purpose of amending Section 2332b(g)(5)(B), then, was to effectively amend those provisions that cross-reference Section 2332b(g)(5)(B). We therefore focus on the substantive statute that arguably creates such an impermissible retroactive effect, rather than the definitional provision that the statute references.

The retroactive application of the updated Limitations Waiver here does not violate the *Ex Post Facto* Clause. "[T]he long-standing rule in this circuit is that Congress has the power to extend the period of limitations without running afoul of the [E]x [P]ost [F]acto [C]lause, provided the original period has not already run." *United States v. Weinlein*, 109 F.4th 91, 100 (2d Cir. 2024) (italics, internal quotation marks, and citation omitted); *accord Stogner v. California*, 539 U.S. 607, 632 (2003) (The *Ex Post Facto* Clause "does not prevent the State from extending time limits for . . . prosecutions not yet time barred."). Here, because the five-year statute of limitations on Saab's receipt of military-training in 2005 had not yet run when Congress amended the Limitations Waiver a year later through its cross-references to Section 2332b(g)(5)(B), the amendment did not "abolish[] an

affirmative defense" in violation of the *Ex Post Facto* Clause. *Collins*, 497 U.S. at 49.

We also conclude that *Landgraf* permits the retroactive application of the Limitations Waiver here. Even assuming that the Limitations Waiver's text is ambiguous as to its temporal reach, its retroactive application does not "create presumptively impermissible retroactive effects." *Weingarten*, 865 F.3d at 55. The Supreme Court has explained that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." *Landgraf*, 511 U.S. at 275. This is because there are "diminished reliance interests in matters of procedure," as they "regulate secondary rather than primary conduct." *Id.*

Courts regularly construe statutes of limitations, in both the civil and criminal contexts, as procedural in nature. *See, e.g.*, *United States v. Norwood*, 49 F.4th 189, 217 (3d Cir. 2022) ("A statute of limitations creates a procedural bar to seeking a remedy or prosecuting a crime but does not extinguish a plaintiff's underlying rights or the crime itself."); *United States v. Carlson*, 235 F.3d 466, 470 (9th Cir. 2000) (characterizing statute of limitations as "a procedural rule"). Thus, in the civil context, we have opined that "[r]etroactivity concerns . . . generally do

not bar the application of a changed statute of limitations to a complaint filed after the amendment" because "[t]he conduct to which the statute of limitations applies is not the primary conduct of the defendants . . . but is instead the secondary conduct of the plaintiffs, the filing of their suit." *Vernon v. Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 890 (2d Cir. 1995). We therefore held that the retroactive application of an amended statute of limitations was "unquestionably proper" because it "impaired no rights possessed by either party, increased neither party's liability, nor imposed any new duties with respect to past transactions." *Id.* (internal quotation marks and citation omitted).

Saab offers no reason why our holding in *Vernon* should not also apply in the criminal context, and we see none. *See, e.g.*, *United States v. Piette*, 45 F.4th 1142, 1161 (10th Cir. 2022) (concluding that the retroactive application of an amended limitations provision was permissible under *Landgraf* step two because "[b]y extending the unexpired statute of limitations, Congress did not increase [the defendant's] exposure to prosecution retroactively. It did not raise the penalty for the charged offense. It did not redefine the offense to make it easier to establish. It did not expose [the defendant] to criminal prosecution anew. It merely altered

28

the ongoing charging period for the conduct that had already exposed him to criminal prosecution."); *United States v. Maxwell*, 534 F. Supp. 3d 299, 316 (S.D.N.Y. 2021) (Nathan, *J.*) (concluding that applying an amended limitations provision "to conduct for which the [original] statute of limitations has not yet expired" would not have impermissible retroactive effects under *Landgraf* step two), *aff'd*, 118 F.4th 256 (2d Cir. 2024).

Saab counters that the government, in a different case before our Court, took the supposedly contrary position that "where a substantive change [to a statute] applies only prospectively, an indirect amendment to the statute of limitations does not apply retroactively." *Knight v. United States*, 576 F. App'x 4, 6 (2d Cir. 2014) (summary order) (quoting government brief). However, the government's legal position in a different case involving a different defendant does not bind the government here and certainly does not tie the Court's hands. *See id.* at 7 (making clear that "we do not express any view as to whether the Government's position in conceding error based on the existence of a statute of limitations defense is correct"). In any event, the government's position in *Knight* does not counsel

against our conclusion that the updated Limitations Waiver here can have retroactive effect.

*Knight* involved an amendment to the murder-for-hire statute, 18 U.S.C. § 1958(a), which increased the offense's maximum penalty to death. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60003(a)(11), 108 Stat. 1796, 1969 (1994). That substantive change to the statute had the indirect effect of waiving the statute of limitations of the offense under a separate statute of general applicability. *See* 18 U.S.C. § 3281 ("An indictment for *any* offense punishable by death may be found at any time without limitation." (emphasis added)). Section 2332b(g)(5), on the other hand, is a definitional provision, not a substantive criminal statute. Thus, in amending Section 2332b(g)(5), Congress's primary purpose, or the intended *direct* effect, was to update other substantive statutes, including the Limitations Waiver, that explicitly cross-reference Section 2332b(g)(5). The government's position in *Knight* therefore has little applicability to the statutory provisions at issue here.

In sum, the district court did not err, let alone plainly so, in applying the Limitations Waiver in this case.

**III.     Foreseeable Risk of Death or Injury after December 17, 2004**

Saab alternatively argues that, even if the Limitations Waiver does apply, the district court erred by failing to instruct the jury that, in order to waive the statute of limitations under that provision for Count Three, the government was required to prove that Saab's receipt of military-type training created a foreseeable risk of death or serious injury after Section 2339D's enactment on December 17, 2004. Relatedly, Saab contends that there was insufficient evidence for the jury to conclude that Saab's receipt of military-type training created such a foreseeable risk. The government again retorts that Saab waived this issue, but that, in any event, Saab cannot satisfy the plain error standard.

*A. Waiver*

The government argues that Saab waived his jury instruction challenge because he proposed the language for the Limitations Waiver jury instruction, which the district court substantially adopted in the charge he now challenges. We are unpersuaded.

To be sure, the government cites cases where we have summarily concluded that a defendant "waived any objection to [the] instruction" because he "proposed

31

nearly identical charging language." *United States v. Caltabiano*, 871 F.3d 210, 219 (2d Cir. 2017). And yet in assessing waiver, our north star is always whether the defendant "intentional[ly] relinquish[ed]" a "known right" under the particular circumstances of a case. *United States v. Crowley*, 318 F.3d 401, 414 (2d Cir. 2003). Thus, for example, in *Crowley*, we rejected the government's contention that the defendant waived his jury instruction challenge because the exchange at the charging conference made clear that the defendant "neither approved nor objected to the judge's proposal" and another defendant's counsel's statement in response to the judge's proposal—"we'll take that, Judge"—could "best be read as acquiescence in the judge's ruling rather than approval or invitation of it." 318 F.3d at 414; *see also Bastian*, 770 F.3d at 218 (refusing to find invited error where the parties "conferred and agreed" on the issue "where so far as appears in the record, [the defendant] neither sought nor gained any tactical advantage from giving up his right" (internal quotation marks omitted)).

In *United States v. Giovanelli*, 464 F.3d 346 (2d Cir. 2006), on the other hand, we found that the defendant waived his objection to the omission of specific language in a particular jury charge because "[i]t was at [defendant's] request—

and with his approval—that [the district court] omitted the [particular] language from the jury charge," and defendant's counsel acknowledged she was "'happy about [that particular omission].' Thus, there was 'approval or invitation' of the omission (indeed, both)." *Id.* at 351 (fifth alteration in original) (quoting *Crowley*, 318 F.3d at 411). These cases teach that waiver admits of no bright-line rule. Instead, our task is always to discern, on the particularities of each individual case, whether the defendant affirmatively approved of, or invited, the error.

Here, although Saab proposed the Limitations Waiver instruction that he now complains of, he neither approved nor invited the specific alleged error challenged here—namely, the absence of a clause instructing the jury that the risk of death or serious bodily injury must be foreseeable after Section 2339D's enactment date. Indeed, the record suggests that neither Saab nor the government was aware that Section 2339D was not enacted until December 2004, and this temporal issue was never raised to the district court's attention. This is therefore not a situation in which Saab intentionally relinquished a known right, attempted to gain a tactical advantage, or exhibits buyer's remorse for a charge he affirmatively invited. *See, e.g.*, *United States v. Perez*, 116 F.3d 840, 844–45 (9th Cir.

1997) (en banc) (holding that a defendant did not waive his right to appeal an erroneous jury instruction, even though counsel affirmatively agreed to it at trial, because there was no "evidence in the record that the defendant . . . considered the controlling law . . . and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction"); *see also Gov't of Virgin Islands v. Rosa*, 399 F.3d 283, 291 (3d Cir. 2005) ("The case before us . . . does not present us with a knowing waiver situation. We do not see any indication that [the defendant's] attorney explicitly stipulated to the erroneous instructions with knowledge of the error in them or refrained from objecting to the jury instructions for tactical reasons."). At bottom, we cannot say that Saab waived an argument he did not know he had.

*B. Merits*

Proceeding to the merits, we conclude that, although the district court erred by not instructing the jury that the Section 2339D violation must create a foreseeable risk of death or serious injury after December 17, 2004 for the Limitations Waiver to apply, Saab cannot satisfy the plain error standard because he was not ultimately prejudiced by that error.

As a threshold matter, we find that there was error, and that it was clear and

obvious. The government contends that the error cannot be plain because no binding authority resolves this issue. But an error can nevertheless be clear or obvious if it violates "the plain language of the statute." *United States v. Polouizzi*, 564 F.3d 142, 156 (2d Cir. 2009); *see id.* (concluding that there was plain error even where "our Circuit has not previously" opined on the interpretation because a contrary reading contradicted "the plain language of the statute"). Under the Limitations Waiver, the foreseeable risk of death or serious injury must be created by or the result of the "the commission of such offense." 18 U.S.C. § 3286(b). And because we have already determined that Saab can be convicted only for receiving military-type training after December 17, 2004, the relevant "commission of the offense" must likewise post-date December 17, 2004. The Limitations Waiver's plain text therefore required the district court to instruct the jury that it must find that Saab's post-enactment receipt of military-type training—namely, the explosives and surveillance training described above—resulted in or created a foreseeable risk of death or serious bodily injury. It was thus clear error to not so instruct the jury.

Nevertheless, Saab cannot demonstrate a reasonable probability that the

35

jury would have concluded that Saab's post-enactment conduct did not create such a foreseeable risk. In another context, we have defined foreseeable harm as a "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) (internal quotation marks and citation omitted); *cf. Foreseeability*, Black's Law Dictionary (11th ed. 2019) ("The quality of being reasonably anticipatable."). Similarly, in the tort context, a consequence is foreseeable if "a reasonably prudent person would anticipate [it] as likely to result" from the performance of an act. *Sec. & Exch. Comm'n v. Rashid*, 96 F.4th 233, 241 (2d Cir. 2024) (alteration in original) (quoting 57A Am. Jur. 2d Negligence § 449 (2023)).

The record is replete with evidence that Saab knew or should have known that death or serious bodily injury would potentially result from his post-enactment explosives and surveillance training. The trial evidence showed Hizballah's well-established track record of deploying IEDs of the kind Saab was trained in. Indeed, Hizballah had previously directed Saab to place an IED in Lebanon that injured an Israeli official. Saab also received explosives training as

36

part of his transition into the ESO, which had the mandate of carrying out terrorist attacks outside Lebanon. Given Hizballah's history of terrorist activity and the context of Saab's substantial and long-standing interactions with the terrorist organization, it was entirely foreseeable, and in fact, highly likely, that Hizballah would direct Saab to utilize his explosives training to build, plant, and detonate an explosive that would cause serious bodily injury to those within its blast radius. *Cf. Gardner v. Q. H. S., Inc.*, 448 F.2d 238, 244 (4th Cir. 1971) (noting that, in the products liability context, "[w]here the issue is one of foreseeability, evidence of what has actually been experienced in the same or comparable situations constitutes proof of the greatest probative value").

Similarly, Saab utilized his early surveillance training to facilitate Hizballah's deadly IED attacks in Lebanon. He also put that training into practice in the United States "to facilitate [Hizballah's] bombing operations against those [surveilled] targets," to "cause the most destruction," and "to allow [Hizballah] to determine the size and placement of the explosives that would be needed to destroy" those targets. App'x at 252, 330. Again, Saab's previous use of his surveillance training to aid Hizballah in planning and carrying out deadly

37

bombings made it highly likely that he would be called on to surveil other potential Hizballah targets in the future.

In sum, given this substantial evidence that the risk of death or serious bodily injury emanating from Saab's post-enactment training was foreseeable, we conclude that no reasonable jury would have found otherwise if they were properly instructed.[6]

## IV. Sentencing Enhancement

Finally, we consider Saab's contention that the district court impermissibly applied, *ex post facto*, the Terrorism Enhancement at sentencing.

Section 3A1.4 provides a twelve-point sentencing enhancement and an automatic criminal history category designation of VI "[i]f the offense is a felony

---

[6] For the same reasons, Saab's challenge to the sufficiency of the evidence as to foreseeability fails. We review such challenges *de novo*, *United States v. Martinez*, 110 F.4th 160, 171 (2d Cir. 2024), and Saab "must show that the evidence, even when viewed most favorably to the government, would not allow *any* rational jury to find" him guilty on Count Three, *United States v. Aquart*, 912 F.3d 1, 46 (2d Cir. 2018) (emphasis in original). Given the extensive evidence at trial, a rational jury could have found beyond a reasonable doubt that Saab's post-enactment training created a foreseeable risk of death or serious bodily injury; indeed, as explained above, no reasonable jury would have found otherwise.

that involved, or was intended to promote, a federal crime of terrorism."  U.S.S.G.

§ 3A1.4.  The Application Notes explain that a "'federal crime of terrorism' has the

meaning given that term in 18 U.S.C. § 2332b(g)(5)."  U.S.S.G. § 3A1.4 cmt. n.1.

Section 2332b(g)(5), in turn, defines a "[f]ederal crime of terrorism" as an offense

that is (1) "calculated to influence or affect the conduct of government by

intimidation or coercion, or to retaliate against government conduct," and

(2) listed in 18 U.S.C. § 2332b(g)(5)(B)(i).

Without the Terrorism Enhancement, Saab's Guidelines range for Count

Three would have been 78 to 97 months' imprisonment instead of the statutory

maximum of 120 months' imprisonment.[7]

Saab did not object to the application of the Terrorism Enhancement at

sentencing, so we once more review for plain error.  *See United States v. Villafuerte*,

---

[7] Section 2339D provides that a person convicted under that provision "shall be fined under this title or imprisoned for ten years, or both."  18 U.S.C. § 2339D.  Although the Presentence Investigation Report ("PSR") states that Section 2339D carries a "mandatory term of imprisonment" of 10 years, PSR at 25, we have understood Section 2339D to prescribe only a statutory ceiling of 10 years' imprisonment. *See United States v. Kourani*, 6 F.4th 345, 359 n.54 (2d Cir. 2024) (describing the receiving military-type training as carrying a maximum of 10 years' imprisonment).

502 F.3d 204, 208–09 (2d Cir. 2007). A district court does not commit plain error by miscalculating or misinterpreting the Guidelines where the "defendant could have received exactly the same sentence in the absence of the alleged error." *United States v. Arigbodi*, 924 F.2d 462, 464 (2d Cir. 1991). "Where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless." *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) (internal quotation marks and citation omitted). We have also stated repeatedly "that the plain error doctrine should not be applied stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context." *United States v. Gamez*, 577 F.3d 394, 397 (2d Cir. 2009) (citing *United States v. Williams*, 399 F.3d 450, 456–57 (2d Cir. 2005)); *accord United States v. Wernick*, 691 F.3d 108, 113 (2d Cir. 2012).

Here, the government concedes that the district court clearly erred in applying the Terrorism Enhancement based on its conclusion that the Section 2339D offense "involved . . . a federal crime of terrorism." U.S.S.G. § 3A1.4. As the government acknowledges, because Section 2339D did not become a "federal

crime of terrorism" until March 2006 (after the cessation of Saab's Hizballah-related conduct in 2005), the district court could not have applied the Terrorism Enhancement on the basis that the offense "involved" that federal crime of terrorism without violating the *Ex Post Facto* Clause. *See United States v. Ortiz*, 621 F.3d 82, 87 (2d Cir. 2010) ("It is enough that using the amended Guidelines created a substantial risk that the defendant's sentence was more severe, thus resulting in a violation of the Ex Post Facto Clause." (alterations adopted) (internal quotation marks and citation omitted)).

The government nevertheless contends that this clear error was not prejudicial. Although the district court did not indicate that it would have imposed the same sentence regardless of the Guidelines calculation, the government argues that the error was harmless because the district court could have alternatively applied the Terrorism Enhancement because Saab "intended to promote . . . a federal crime of violence." U.S.S.G. § 3A1.4. "[A]n offense is 'intended to promote' a federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism as that term is defined in 18 U.S.C. § 2332b(g)(5)." *United States v. Awan*, 607 F.3d 306, 314

41

(2d Cir. 2010). The government summarily argues that Saab's conduct was intended to promote Hizballah's "numerous federal crimes of terrorism," including 18 U.S.C. § 2332b (acts of terrorism transcending national boundaries), 18 U.S.C. § 2332f (bombing of public places and facilities), 18 U.S.C. § 2339A (providing material support to terrorists), and 18 U.S.C. § 2339B (providing material support to designated foreign terrorist organizations). Gov. Br. at 57 (internal quotation marks and citation omitted).

However, because this alternative ground was not presented to the district court and the government has failed to adequately explain what evidence in the record "indicates clearly" that the district court would have imposed the Terrorism Enhancement under this alternative theory, we conclude that a remand for resentencing is warranted. *Jass*, 569 F.3d at 68; *Wernick*, 691 F.3d at 118 (explaining that given the "relatively low cost of correcting the miscalculation," remand for resentencing is especially appropriate where an error results in a "dramatic impact on the Guidelines calculation"); *see also United States v. Fiorelli*, 133 F.3d 218, 225 (3d Cir. 1998) (remanding for resentencing "out of an abundance of caution . . . to provide an opportunity for the district court to make its views clear" regarding the

application of a Guidelines enhancement); *United States v. Snoddy*, 139 F.3d 1224, 1232 (8th Cir. 1996) ("[I]n an abundance of caution, we will remand to the district court for specific factual determinations of [the defendant's] role in the offense and resentencing under a correct construction of [the relevant sentencing guideline]."); *United States v. Innamorati*, 996 F.2d 456, 471 (1st Cir. 1994) ("This may have no effect on [the defendant's] actual sentence . . . but out of an abundance of caution we remand his case to the district court for resentencing.").

The dissent suggests that we have "effectively rewrit[ten] section 3A1.4 to provide that a twelve-level enhancement applies only 'if the offense *is* a federal crime of terrorism,'" even though "the actual language of the Guideline sweeps more broadly." *Post* at 1–2 (emphasis in original). That suggestion by the dissent is surprising given that, as the dissent acknowledges, we have explicitly quoted the actual language of Section 3A1.4 in full above, which makes clear that the enhancement applies if the offense of conviction "involved," or was "intended to promote," a federal crime of terrorism. U.S.S.G. § 3A1.4.

The reason that we have not engaged in any further analysis of the "involved" prong is by no means an attempt to rewrite the Guidelines provision,

but rather is simply a reflection of the fact that the government does not rely upon that prong at all in attempting to defend the district court's sentence on this appeal under the plain error standard. Indeed, as also noted above, the government concedes that "the District Court erred in its determination that Saab's offense 'involved' a federal crime of terrorism," and then immediately turns its attention exclusively to the "intended to promote[] a federal crime of terrorism" prong, which it argues "provides an independent basis to apply the Terrorism Enhancement." Appellee's Br. at 57.

Therefore, although the dissent contains a seven-page analysis of the facts in the record that it believes could support a finding that the crime of conviction involved another federal crime of terrorism not enumerated by the district court, *see post* at 2–8, we conclude that it is more prudent to allow the district court to make any such determinations in the first instance. This is especially true given that the theories for imposing the enhancement posited for the first time by the

44

dissent as to this prong were not even raised by the government in the district court or on appeal, and thus were not even briefed by the parties.[8]

For example, the dissent speculates that, *inter alia*, the district court could have found that Saab's conduct involved conspiring to provide material support to Hizballah under 18 U.S.C. § 2339B, which is an enumerated "federal crime of terrorism," even though Saab was acquitted of that conduct. *See post* at 7 n.2. To be sure, as the dissent accurately notes, "[i]t is well-settled . . . that district courts may consider acquitted conduct in sentencing so long as that conduct has been proved by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). However, a district court is by no means required to consider acquitted conduct, and there is nothing in the record to suggest, one way or the other, whether it would have done so here to support the application of the Terrorism Enhancement. *See United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) ("We restate . . . that while district courts may take into account acquitted

---

[8] In the district court, the only federal crime of terrorism upon which the government relied to support the enhancement, under either prong of the Guidelines provision, was Section 2339D.

conduct in calculating a defendant's Guidelines range, they are not required to do so. Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence.").

Thus, in remanding on these new potential theories identified by the dissent for imposing the Terrorism Enhancement under the "involved a federal crime of terrorism" prong, we seek to avoid encroaching upon the district court's unique and central role in making a sentencing determination by allowing it to consider these sentencing issues and arguments in the first instance in the context of its broad sentencing discretion.

We reach the same conclusion with respect to the conclusory arguments raised by the government as to the "promoting a federal crime of terrorism" prong, again notwithstanding the dissent's efforts to bolster the government's reasoning on appeal as to that prong.[9] *See Wernick*, 691 F.3d at 117 ("An unobjected-to error

---

[9] Although the dissent relies upon our decision in *Jass* to support its view that there is no need to remand for resentencing under the circumstances presented here, that reliance is misplaced. In *Jass*, we concluded that the procedural error in the calculation of the

46

in Guidelines calculation may satisfy the third prong (that the error affects

substantial rights) and fourth prong (that failure to notice the error would call into

question the fairness or public integrity of proceedings) of the traditional test

because a district court's miscalculation of the Guidelines sentencing range

carrie[s] serious consequences for the defendant." (internal quotation marks and

citation omitted)); *see also United States v. Le*, 126 F. 4th 373, 381 (5th Cir. 2025)

("Given the limited record in the district court and briefing on appeal regarding

---

Sentencing Guidelines was harmless "because the district court clearly stated that it would have imposed the same sentence in any event," under the sentencing factors set forth in Section 3553(a).  569 F.3d at 69; *see also id*. at 68 ("[T]he district court unequivocally stated that it would impose the same 65–year sentence on [the defendant] however 'the issue of two-point enhancement . . . ultimately works out [on appeal].'   Under these circumstances, we can confidently conclude that the district court's application of [the Guidelines provision] constitutes harmless sentencing error." (internal citations and first alteration omitted)).  Here, unlike in *Jass*, the district court never indicated that it would have independently reached the same sentence under the Section 3553(a) factors, even if the Terrorism Enhancement did not apply.  The dissent's reliance on *United States v. Barker*, 723 F.3d 315 (2d Cir. 2013), is similarly misplaced because the alternative ground upon which we relied in affirming the sentence involved a pure issue of law, rather than a prediction as to whether a district court would apply a Guidelines enhancement based upon factual and legal predicates that were never even presented to it.  *See id*. at 324 ("[A]lthough the district court applied a modified categorical approach, there was no prejudice to [the defendant] because the record permits us to conclude under a categorical approach that [the defendant's] Vermont conviction triggers section 2252(b)(2)'s sentencing enhancement.").

47

these newly raised grounds for affirmance, we decline to reach them in the first instance. Instead, we vacate [the sentence] and remand for the district court to address the Government's alternative grounds for applying the [] enhancement with the benefit of more developed argument from the parties.").

In sum, contrary to the dissent's assertion, we have not "misse[d] the forest for the trees by remanding this case for resentencing." *Post* at 10. Instead, we find it more prudent and more respectful of the district court's broad discretion in making sentencing determinations—especially in light of the conceded error, the lack of adequate appellate briefing on the various alternative grounds raised by the dissent (which were not raised or addressed in the district court), and the Terrorism Enhancement's "dramatic impact on the Guidelines calculation," *Wernick*, 691 F.3d at 118—to vacate the sentence and remand for resentencing so as to allow the district court in the first instance to consider, after full briefing from the parties, whether the Terrorism Enhancement should apply in this case.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions, **VACATE** the sentence and **REMAND** the case for resentencing consistent with this opinion.

RICHARD J. SULLIVAN, *Circuit Judge*, concurring in part and dissenting in part:

I join the majority opinion in all respects but one: I see no reason to remand to the district court for resentencing. In my view, a remand is unwarranted because Saab's conduct both (1) "involved" several then-enumerated "federal crime[s] of terrorism," and (2) was "intended to promote" federal crimes of terrorism. U.S.S.G. § 3A1.4. I would therefore affirm the district court in full.

As the majority explains, section 3A1.4 authorizes a twelve-level sentencing enhancement "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." Majority Op. at 38–39. The Application Notes, in turn, provide that a "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." U.S.S.G. § 3A1.4 cmt. n.1. And section 2332b(g)(5), for its part, defines a "[f]ederal crime of terrorism" as an offense that is (1) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (2) listed in 18 U.S.C. § 2332b(g)(5)(B)(i).

The majority opinion effectively rewrites section 3A1.4 to provide that a twelve-level enhancement applies only "if the offense *is* a federal crime of terrorism." *See* Majority Op. at 38–39, 43–44. But the actual language of the

Guideline sweeps more broadly, requiring only that the defendant's offense "*involved*" or was "*intended to promote*" a federal crime of terrorism. U.S.S.G. § 3A1.4 (emphases added). And "[w]here, as here, the language of the Guidelines provision is plain, the plain language controls." *United States v. Mingo*, 340 F.3d 112, 114 (2d Cir. 2003); *see also United States v. Stewart*, 590 F.3d 93, 137 (2d Cir. 2009) ("We interpret the Guidelines as though they were a statute, giving the words used their common meaning.").

## I. The Sentencing Enhancement Applies Because Saab's Conduct "Involved" Several Then-Enumerated Federal Crimes of Terrorism.

I begin with the "involved" prong of section 3A1.4, which this Court has previously analyzed in *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010). There, we explained that "the ordinary meaning of 'involved' is 'to have within or as part of itself,' or to 'include.'" 607 F.3d at 313 (quoting Webster's Third New International Dictionary 1191 (2002)); *see also United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) ("The ordinary and plain meaning of 'involved' means 'to include.'"). Based on this definition, we concluded that "a defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of

2

terrorism as defined in 18 U.S.C. § 2332b(g)(5), *or* his relevant conduct includes such a crime." *Awan*, 607 F.3d at 313–14 (emphasis added).

While I agree that 18 U.S.C. § 2339D – the crime for which Saab was convicted – "did not [itself] become a 'federal crime of terrorism' until March 2006 (after the cessation of Saab's Hizballah-related conduct in 2005)," Majority Op. at 40–41, Saab's "relevant conduct include[d]" several other then-enumerated federal crimes of terrorism, *Awan*, 607 F.3d at 313; *see, e.g.*, 18 U.S.C. § 2332b ("Acts of terrorism transcending national boundaries"); *id.* § 2332f ("Bombings of places of public use, government facilities, public transportation systems and infrastructure facilities"); *id.* § 2339A ("Providing material support to terrorists"); *id.* § 2339B ("Providing material support or resources to designated foreign terrorist organizations.").[1] After all, as *Awan* rightly pointed out, a felony can *involve* a federal crime of terrorism while not actually *being* a federal crime of terrorism. *Cf., e.g., United States v. King*, 325 F.3d 110, 113 (2d Cir. 2003) ("The word 'involving' has expansive connotations."); *Hollis v. United States*, 958 F.3d 1120, 1122 (11th Cir.

---

[1] The government concedes that the district court erred in determining "that Saab's offense 'involved' a federal crime of terrorism." Gov't Br. at 57 (citing App'x at 1596). But "[t]his Court, of course, is not bound to accept the [g]overnment's concession that the courts below erred on a question of law." *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953) (Jackson, J.); *see also United States v. Smith*, 621 F.2d 483, 489 n.3 (2d Cir. 1980) ("[A] concession by the [g]overnment on a question of law is never binding on this Court.")

3

2020) ("interpret[ing] the word 'involving' broadly" in the context of the Armed Career Criminal Act); *United States v. Brandon*, 247 F.3d 186, 190 (4th Cir. 2001) (emphasizing that "the word 'involving' itself suggests" that the relevant subsection "should be read expansively").

Take, for example, money laundering. Standing alone, money laundering is not a terrorism offense. *See* 18 U.S.C. § 1956(a)(2)(A) (money-laundering statute criminalizing the transfer of funds "with the intent to promote the carrying on of specified unlawful activity"). But when a defendant launders money to finance terrorist-related activities, the offense necessarily "involves" a federal crime of terrorism, making the sentencing enhancement applicable. And here – on plain error review, no less – a faithful interpretation of the record demonstrates that Saab's conduct clearly "involved" several crimes of terrorism.

The district court's factual findings bear this out. At sentencing, the court "adopt[ed] the findings of fact in the revised presentence report." App'x at 1591; *see also United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015) ("The district court's factual findings at sentencing need be supported only by a preponderance of the evidence."). We review those factual findings for clear error. *United States v. Washington*, 103 F.4th 917, 920 (2d Cir. 2024). In particular, the PSR found that:

- "Hizballah is a Lebanon-based Shia Islamic organization" possessing "terrorist components." PSR ¶ 16. Its External Security Organization ("ESO") – of which Saab "was a sleeper cell operative" – "has engaged in terrorist activities" and "operat[ed] for years in the United States" so that the organization could "plan terrorist attacks in the United States." *Id.* ¶¶ 17, 26.
- Saab "gathered intelligence to identify the most vulnerable points of attack at various landmarks and critical infrastructure in New York City and elsewhere." *Id.* ¶ 27.
- "[Saab] provided surveillance photographs and detailed notes to Hizballah concerning these landmarks and infrastructure to maximize damage and destruction in any future attack." *Id.*
- "[Saab] attempted to shoot and kill a suspected Israeli spy in Lebanon." *Id.*
- Saab and his brother, Bassem Saab, "who was reportedly a Hizballah operative, planted an improvised explosive device designed to target and kill Israeli soldiers." *Id.*
- "A significant focus of Saab's training with Hizballah was the use of explosives[,] and Saab underwent three weeks of explosives training that incorporated training in triggering mechanisms, explosive substances, detonators, and the assembly of circuits." *Id.* ¶ 34 (capitalization altered, alteration adopted, and internal quotation marks omitted).
- Saab "participated in two violent attacks in Lebanon," including "plant[ing] an IED with [his] brother, Bassem Saab, targeting an Israeli troop convoy." *Id.* ¶ 40 (footnote omitted). And Saab "conducted surveillance and training activity in the United States to further Hizballah's activity to bomb the United States." *Id.* ¶ 46.

The district court also emphasized at sentencing that "Saab does not and cannot reasonably dispute that Hizballah's objective is to influence governments through violence," App'x at 1593–94, and it described how "Saab's military

5

training was obviously directed towards furthering Hizballah's ultimate goals, which include, among other things, ending Israel's occupation of Southern Lebanon through violent means," *id.* at 1594–95. The court found that "[b]etween 2003 and 2005, Saab conducted extensive surveillance activities in New York City, Boston, and Washington, D.C. to facilitate Hizballah's bombing operations against those targets in the event it chose to undertake such operations, and to enable Hizballah to cause the most destruction." *Id.* at 1618 (internal quotation marks omitted). And it referenced Saab's "attempt[] to shoot [a] man" in Beirut on his mentor's instructions, *id.* at 1620, as well as his extensive training in constructing and handling explosives, *id.* at 1619.

The district court's factual findings likewise confirm that Saab's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," fulfilling the first prong of 18 U.S.C. § 2332b(g)(5)'s definition of a "[f]ederal crime of terrorism." 18 U.S.C. § 2332b(g)(5)(A); *see also United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014) ("[The defendant] planned his offense – whatever his reasons or motivations – with the purpose of influencing or affecting government conduct."). Indeed, immediately after the district court recited the terrorism-sentencing

enhancement's elements, it emphasized that "Saab does not and cannot reasonably dispute that Hizballah's objective is to influence governments through violence." App'x at 1593–94 (internal quotation marks omitted). And "so long as the government shows by a preponderance of the evidence that [Saab] had the specific intent to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," it has satisfied its burden. *Awan*, 607 F.3d at 317 (citation and internal quotation marks omitted); *see also* App'x at 1595 ("Saab's military training was obviously directed towards furthering Hizballah's ultimate goals, which include . . . violent means.").

Even though section 2332b(g)(5)(B) did not enumerate section 2339D as a "federal crime of terrorism" until March 2006, there can be no question that Saab's activities during the relevant period of offense conduct (chronicled above) "involved" several then-enumerated federal crimes of terrorism.[2] In other words,

---

[2] The jury acquitted Saab of conspiring to provide material support to Hizballah in violation of 18 U.S.C. § 2339B ("Count One"), and was unable to reach a verdict on the count charging him with providing material support to Hizballah, in violation of 18 U.S.C. §§ 2339B and 2 ("Count Two"). It is well-settled, however, that district courts may consider acquitted conduct in sentencing "so long as that conduct has been proved by a preponderance of the evidence." *United States v. Delva*, 858 F.3d 135, 160 (2d Cir. 2017) (quoting *United States v. Watts*, 519 U.S. 148, 157 (1997)). And while it is true that the current version of the advisory Sentencing Guidelines precludes courts from considering acquitted conduct, *see* U.S.S.G. Amend. (Nov. 1, 2024) at 1–4; U.S.S.G. § 1B1.3(c), that amendment post-dated sentencing in this case.

regardless of the fact that Saab's crime of conviction was not yet eligible for the terrorism enhancement, his "relevant conduct include[d]," *Awan*, 607 F.3d at 314, several crimes that were.

## II. The Sentencing Enhancement Also Applies Because Saab "Intended To Promote" Several Federal Crimes of Terrorism.

Saab's offense conduct also satisfied the alternative prong of U.S.S.G. § 3A1.4 in that it was clearly "intended to promote" federal crimes of terrorism.

The majority criticizes the government for "summarily argu[ing] that Saab's conduct was intended to promote Hizballah's 'numerous federal crimes of terrorism,'" Majority Op. at 42 (quoting Gov't Br. at 57), and emphasizes that this theory was neither presented to nor relied upon by the district court. But we are "free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *United States v. Barker*, 723 F.3d 315, 319 (2d Cir. 2013) (internal quotation marks omitted). And as we have repeatedly held, "[w]here we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) (internal quotation marks omitted).

8

In *Awan*, we defined "promote" as meaning "to bring or help bring into being," to "contribute to the growth, enlargement, or prosperity of," or to "encourage" or "further." 607 F.3d at 314 (quoting Webster's Third New International Dictionary 1815 (2002)). We then explained that – "according to the ordinary meaning" of section 3A1.4's plain terms – "an offense is 'intended to promote' a federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism as that term is defined in 18 U.S.C. § 2332b(g)(5)." *Id.*; *see also Stewart*, 590 F.3d at 137. Based on this construction of the Guidelines, we "join[ed] the other Circuits" in concluding that "a defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism." *Awan*, 607 F.3d at 315 (alteration adopted and internal quotation marks omitted) (citing *Arnaout*, 431 F.3d at 1002; *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004)).

Given the district court's adoption of the PSR's findings that Saab (1) "conducted surveillance and training activity in the United States to further

9

Hizballah's activity to bomb the United States," PSR ¶ 46, (2) "attempted to shoot and kill a suspected Israeli spy in Lebanon," *id.* ¶ 27, and (3) "planted an improvised explosive device designed to target and kill Israeli soldiers," *id.* – among other things – it strains credulity to argue that Saab did *not* "intend[] to promote": "acts of terrorism transcending national boundaries," 18 U.S.C. § 2332b; "[b]ombings of places of public use" and "infrastructure facilities," *id.* § 2332f; the "[p]rovi[sion of] material support to terrorists," *id.* § 2339A; or the "[p]rovi[sion of] material support or resources to designated foreign terrorist organizations," *id.* § 2339B; *see also United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011), as revised (Dec. 27, 2011) ("[A]lthough the defendants were not convicted of underlying terrorist acts, the PSR[] adequately explained the basis for the enhancement and the district court made explicit factual findings.").

\* \* \*

In sum, my disagreement with the majority is small. But the majority nonetheless misses the forest for the trees by remanding this case for resentencing. Though Saab's offense of conviction was not yet a "federal crime of terrorism" at the time he committed it, the Guidelines enhancement mandated only that the defendant's offense "involved" or "promote[d]" an enumerated offense. And the

10

record clearly reflects that Saab's offense "involved" crimes of terrorism, and that Saab "intended to promote" such crimes. I would therefore affirm the district court's judgment in all respects. Because the majority concludes otherwise, I respectfully dissent from that portion of the opinion.